UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

Erik J. Delia,                                    Chapter 7
                                                  Case Number 14-46601
      Debtor                              Hon. Mark A. Randon
_____/

Richard Sefton and
Restaurant Staffing Incorporated,

    Plaintiffs,

v.                                                Adversary Case Number 14-04741

Erik J. Delia,

    Defendant.
_____/

## OPINION AND ORDER OVERRULING PLAINTIFFS' OBJECTION TO DEFENDANT'S CHAPTER 7 DISCHARGE

### I.    INTRODUCTION

Erik Delia and Richard Sefton were once close friends. Delia repaired and restored several automobiles for Sefton. He also worked in various capacities for Sefton's fast food restaurants. The two often traveled the state together in a motor home and socialized after work. But in 2013, their relationship soured: Delia was injured while working for Sefton and filed a workers' compensation claim against Sefton's company,

Restaurant Staffing Incorporated ("RSI"); Sefton sued and obtained a default judgment against Delia for improper use of a company credit card.

In 2014, Delia filed Chapter 7 bankruptcy; Sefton and RSI ("Plaintiffs") filed this adversary proceeding seeking to have Delia's discharge denied under 11 U.S.C. § 727(a)(4)(A).[1] Sefton says Delia made a false oath on his bankruptcy schedules and at the 341 meeting of creditors about two vehicles – one of which Sefton traded to Delia while they were still friends.

The Court conducted a trial on March 16, 2015. The parties stipulated to all admitted exhibits, and the Court heard credible testimony from Delia and his father. Sefton did not testify. Because Delia's statements or omissions were not made with fraudulent intent, the Court **OVERRULES** Plaintiffs' objection to his discharge.

## II. JURISDICTION

This is a core proceeding under 28 U.S.C. § 157(b)(2)(J); the Court has jurisdiction pursuant to 28 U.S.C. § 1334(a) and § 157(a).

## III. FACTS

The Court finds the following facts based on the testimony and exhibits admitted at trial:

---

[1] The Court previously granted Delia's motion for summary judgment under 11 U.S.C. § 523(a), and Plaintiffs abandoned their claims for relief under 11 U.S.C. §§727(a)(2) and (5).

### A. *Sefton and the 1969 Pontiac Catalina*

Delia met Sefton in 2008. Sefton needed body work done on a car; Delia operated a collision shop and had years of experience restoring cars. Apparently pleased with Delia's work, over the next few years Sefton had Delia work on approximately ten more vehicles. The two became friends.

Sefton owns six Wendy's restaurants across Michigan. In 2011, he asked Delia to work for his restaurant business. Delia moved from doing part-time work driving Sefton's motor home between restaurants, to facilities' manager; he also continued to occasionally repair cars for Sefton. As the professional relationship between Delia and Sefton developed, so did the personal: the two socialized often – eventually, nearly every day; they attended car shows, traveled, and went to bars together. Delia came to think of Sefton as a brother.

Sefton often bartered for Delia's services. In April 2013 – in one such exchange – Delia did a $600.00 to $800.00 paint job on a 1979 Lincoln for Sefton's friend. In return, Sefton gave Delia a 1969 Pontiac Catalina; at the time, Delia estimated the Catalina was not worth much more than $600.00 – it was a fair exchange. The car was titled in the name of Richard Joel Francis, the owner before Sefton. Delia did not transfer title to his name. Instead, he delivered the Catalina – and the title bearing Francis' name – to his

father, Josue Delia, as a gift.[2] But the Catalina was in poor condition and not running. So, after surprising his father with the car, the two spent a few months repairing it.

It didn't take long for the close relationship between Sefton and Delia to deteriorate. In the late summer of 2013, around the time Delia's divorce was nearly finalized, Delia was seriously injured: he fell off a roof while working at one of Sefton's restaurants and injured his arm and shoulder. He attempted to continue working for Sefton for the next month, but ultimately failed; out of a job, Delia filed a workers' compensation claim against RSI.[3]

Soon after, Sefton sued Delia, alleging – among other claims – misuse of a company credit card. He obtained a $40,000.00 default judgment against Delia: Delia could not afford to defend the lawsuit.

### B. *Delia's Divorce and the 1966 Chevy Pickup Truck*

Delia also owned a 1966 Chevy Pickup Truck. He bought it a decade earlier for $50.00 – it was in poor condition. Over the years, he put in a lot of time restoring it.

Delia's October 2013 divorce judgment awarded the truck to his son, who was then a minor. At the time of Delia's divorce, it was worth approximately $7,000.00. But its condition, along with its value, depreciated significantly. Delia estimates that, as of January 2014, it was worth just $1,200.00, because the motor had blown and the body

---

[2]As a youth, Delia totaled his father's 1955 Buick. His father never let him forget it. Delia hoped that giving him the Catalina would – finally – make things right.

[3]Delia's workers' compensation claim is still pending.

-4-

14-04741-mar    Doc 40    Filed 03/24/15    Entered 03/24/15 13:25:17    Page 4 of 12

was damaged when beams from his garage fell on it. So, with his son's permission, Delia gave the truck to his father in January 2014, as payment on a pre-existing debt.[4] Delia's father did not immediately transfer title into his name.

After receiving the damaged truck, Delia's father paid for a new motor and all of the other replacement parts; father and son worked together to make the repairs. The two later entered the truck into Detroit's March 2014 AutoRama.

### C. *Transfer of the Vehicles' Titles*

The combination of Delia's divorce, work injury, unemployment, and fallout with Sefton took an emotional and physical toll on Delia. He decided to move to Florida for a new beginning.[5]

Delia's father urged him to transfer titles to the Catalina and the Chevy Pickup before he moved. On January 8, 2014, Delia went to the Michigan Secretary of State to complete the applications. Title to the Catalina was transferred from Francis to Delia, and then simultaneously from Delia to his father. Title to the Chevy Pickup was transferred from Delia to his father.

### D. *Sale of the 1969 Catalina and 1966 Chevy Pickup Truck*

Soon after transferring the titles – in January or February of 2014 – Delia mentioned to an auto shop owner that his father wanted to sell the Catalina. Delia

---

[4]Over the years, Delia's father had loaned him thousands of dollars, though Delia's father did not keep a running tab; Delia's father also helped Delia pay for his divorce.

[5]Delia currently lives in Florida.

-5-

14-04741-mar    Doc 40    Filed 03/24/15    Entered 03/24/15 13:25:17    Page 5 of 12

facilitated contact between his father and an interested party that the shop owner knew: a Warren police officer.

Delia's father sold the Catalina to the police officer for $600.00. Delia was not involved in the negotiation of the price; Delia's father simply asked Delia to retrieve payment from the police officer on his behalf. Delia passed a sealed envelope containing the payment to his father. Delia's father told Delia he had sold the Catalina for $3,000.00; he did not want to upset Delia, who believed the Catalina was worth at least $1,200.00. Delia's father eventually gave Delia the $600.00 to pay bills. After the March 2014 AutoRama, Delia's father also sold the truck for $15,000.00.

On April 25, 2014, in an attempt to irritate Sefton – who had given him the car in trade – Delia posted photos of the Catalina on Facebook and falsely bragged that he had actually sold it for $4,500.00, despite only investing $100.00.

### E. The Bankruptcy

Delia filed his Chapter 7 petition on April 16, 2014. His summary of schedules stated that he had unsecured debt of $175,757.00 against assets of only $6,800.00.[6] Sefton was listed as an unsecured creditor on Schedule F; Delia's father was not. The Chevy Pickup and the Catalina were not listed anywhere on the schedules.

At his section 341 meeting of creditors – held just over a month after he filed his petition and schedules – Delia explained that he filed for bankruptcy after his divorce and the failure of his car restoration business. He also affirmed that his schedules and

---

[6]Delia represented he had $201.00 in secured debt.

Statement of Financial Affairs were truthful and accurate. Delia was on pain medications that day.

When Sefton's lawyer asked Delia, at the 341 meeting, whether he ever had an ownership interest in the Catalina, Delia initially testified that he had. He then stated that he never owned it but had sold it one year earlier to a police officer for $3,000.00; it was in poor condition at the time. Delia also testified that he received money from the sale and used it to pay for his living expenses.

Delia testified that he had owned the Chevy Pickup. Before December 2013, he had given it to his father because he owed him about $4,000.00. Delia testified that, at the time, the truck was likely not worth much more than $2,000.00: it needed repairs and had a blown motor.

Plaintiffs filed this adversary proceeding two months later.

On September 9, 2014, Delia filed amendments to his Statement of Financial Affairs; they included the transfers of the two vehicles. His amended Statement of Financial Affairs indicated that on January 14, 2014, Delia transferred the Chevy Pickup to his father as payment on debts Delia owed him. The value of the Chevy Pickup was listed as $1,200.00 – the motor was blown and the truck had other damage.

Delia's amended Statement of Financial Affairs indicates he gave the Catalina to his father in April 2013 but title was not transferred until January 14, 2014; the value of the vehicle was $1,000.00; and it was in poor condition. Delia also stated that he never tried to sell the car; he gave it to his father.

-7-

14-04741-mar    Doc 40    Filed 03/24/15    Entered 03/24/15 13:25:17    Page 7 of 12

## IV. CONCLUSIONS OF LAW

Section 727(a)(4)(A) directs the Court to grant a discharge unless: "the debtor knowingly and fraudulently, in or in connection with the case – made a false oath or account[.]" 11 U.S.C. § 727(a)(4)(A). To deny a debtor's discharge under this section, a plaintiff must demonstrate – by a preponderance of the evidence – that:

> (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case.

*Keeney v. Smith (In re Keeney)*, 227 F.3d 679, 685 (6th Cir. 2000). Statements made on Delia's bankruptcy schedules, Statement of Financial Affairs, and at his 341 meeting are all statements made under oath. *Noland v. Johnson (In re Johnson)*, 387 B.R. 728, 743 (Bankr. S.D. Ohio 2008) (citing *Hamo v. Wilson (In re Hamo)*, 233 B.R. 718, 725 (6th Cir. BAP 1999)). Whether a debtor's statements or omissions constitute a false oath under section 727(a)(4)(A) is a question of fact. *In re Keeney*, 227 F.3d at 685.

The right to a discharge in bankruptcy is liberally construed. *Newman v. Burnham (In re Newman)*, 126 F.2d 336, 337 (6th Cir. 1942) (citations omitted); *see also In re Keeney*, 227 F.3d at 683. "The reasons for denying a discharge to a bankrupt must be real and substantial, not merely technical and conjectural. A debtor is entitled to a starting presumption that most debtors are honest and do not ordinarily engage in fraudulent activities." *Stevenson v. Cutler (In re Cutler)*, 291 B.R. 718, 727 (Bankr. E.D. Mich. 2003).

The parties disagree about whether Delia's initial failure to disclose the transfer of the vehicles and his later statements, at the 341 meeting and in his amended Statement of Financial Affairs, were made with fraudulent intent. The Court concludes they were not.

To obtain a discharge, debtors must be completely transparent about their finances. *Browning v. Levy*, 283 F.3d 761, 775 (6th Cir. 2002) ("A debtor has an affirmative duty to disclose all of [his] assets to the bankruptcy court[.]"); *In re Cutler*, 291 B.R. at 726 (noting that a deliberate omission from the debtor's schedules may be grounds for denying a discharge). "[I]ntent to defraud involves a material representation that you know to be false, or, what amounts to the same thing, an omission that you know will create an erroneous impression." *In re Keeney*, 227 F.3d at 685 (internal quotations omitted). It may also be established by a debtor's material misrepresentation made with reckless disregard as to its truth. *Id*. at 686.

Fraudulent intent requires actual – not constructive – fraud. However, because debtors rarely admit fraudulent intent, it may be inferred from the circumstantial evidence. *In re Cutler*, 291 B.R. at 726 (quoting *Rouse v. Stanke (In re Stanke)*, 234 B.R. 449, 458 (Bankr. W.D. Mo. 1999)). For example, "[a] series or pattern of errors or omissions may have a cumulative effect giving rise to an inference of an intent to deceive." *In re Cutler*, 291 B.R. at 726 (quoting *Rouse v. Stanke (In re Stanke)*, 234 B.R. 449, 458 (Bankr. W.D. Mo. 1999)). But if the false information is the result of mistake or inadvertence, the debtor remains entitled to a discharge. *McDermott v. Schwartz (In re Schwartz)*, 2015 WL 1010490, at *6 (Bankr. E.D. Mich. March 3, 2015) (quoting *In re*

*Keeney*, 227 F.3d at 685-86). "[A] finding of fraudulent intent is a question of fact that is highly dependent on the bankruptcy court's assessment of the debtor's credibility." *Jahn v. Hughes (In re Hughes)*, 490 B.R. 784, 792 (Bankr. E.D. Tenn. 2013) (internal quotations and citation omitted); *Harker v. West (In re West)*, 328 B.R. 736, 750 (Bankr. S.D. Ohio 2004) ("[R]esolution of the question of whether a false statement was made with intent to deceive will [often] turn on the Court's assessment of the demeanor and credibility of the debtor.")

The Court finds Delia's testimony credible; his inaccurate statements and omissions were the product of either mistake or inadvertence.

First, Delia exhibited forthrightness following his failure to disclose the transfers in his initial filings. He admits that he failed to disclose the transfers of the Catalina and the Chevy Pickup on his initial Statement of Financial Affairs. However, since then, Delia has not denied that the transfers occurred: he admitted to transferring the vehicles at his 341 meeting, ultimately amended his Statement of Financial Affairs, and admitted to the transfer of vehicles in response to Plaintiffs' first set of interrogatories. *See In re Hughes*, 490 B.R. at 792 ("Disclosure or correction of an inaccuracy at the first meeting of creditors is evidence that there was no fraudulent intent."); *Buckeye Ret. Co., LLC v. Heil (In re Heil)*, 289 B.R. 897, 908 (Bankr. E.D. Tenn. 2003) ("Generally, a debtor's amendment of his schedules and/or reporting of omissions or misstatements prior to or at the meeting of creditors evidences a lack of fraudulent intent.").

Second, any discrepancies regarding the circumstances surrounding the transfer of the two vehicles or their value are minor in substance. And the only alleged discrepancies in Delia's filings concern the Catalina and the Chevy Pickup: Plaintiffs point to no other misrepresentations or omissions in Delia's statements or filings (e.g., the underestimation of other assets or debt; an erroneous list or number of creditors; or failure to report income or other transfers). After investigation, the Chapter 7 Trustee has determined that Delia does not have any non-exempt assets. Plaintiffs have failed to paint the picture of a pattern of omissions or inconsistencies that would justify denial of Delia's discharge under section 727(a)(4)(A). *In re Cutler*, 291 B.R. at 726 (finding "numerous false statements . . . give rise to an inference of an intent to deceive").

Third, Delia offered plausible explanations for his initial failure to disclose the transfers of the vehicles and any inconsistencies regarding the value or condition of the vehicles. Regarding his testimony at the 341 meeting, Delia explained that he gave contradictory answers about whether he owned the Catalina because he initially thought he was being asked about whether the title to the Catalina was ever in his name. It was not. Delia admitted that he testified at the 341 meeting to selling the Catalina, but explained that his father had handled the sale (he merely facilitated it). His father then handed him money from the envelope, which he used to pay bills.

Delia also testified that he was on medications when he signed his initial schedules and inadvertently neglected to include the transfers; he was nervous and still on medications at the time of his 341 meeting, which impeded a full explanation of the

-11-

events surrounding the vehicles; Delia explained that his father told him initially that he sold the Catalina for $3,000.00, but later told him that he sold it for $600.00; Delia reasonably explained why the Catalina was offered as a gift to his father, whereas the Chevy Pickup was offered to settle longstanding debts; and Delia explained why transfer of the vehicles' titles occurred simultaneously in January 2014. Delia's father's testimony was overwhelmingly consistent with Delia's. The Court observed the demeanor of Delia and his father while they testified – both were credible witnesses.

Plaintiffs failed to prove the requisite fraudulent intent for denial of discharge under section 727(a)(4)(A).

## V. CONCLUSION

Because Delia's statements were not made with fraudulent intent, the Court **OVERRULES** Plaintiffs' objection to his discharge under section 727(a)(4)(A).

**IT IS ORDERED.**

**Signed on March 24, 2015**

　　　　　　　　　　　　　　　　　　　　　　／s／ Mark A. Randon
　　　　　　　　　　　　　　　　　　　**Mark A. Randon**
　　　　　　　　　　　　　　　　　　　**United States Bankruptcy Judge**